| | | |
|---|---|---|
| THERON AND SHERRY PFANTZ | * | NO. 2025-CA-0300 |
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| DR. DWIGHT MCKENNA IN HIS CAPACITY AS THE CORONER, ORLEANS PARISH CORONER'S OFFICE, AND ABC INSURANCE COMPANY | * | FOURTH CIRCUIT |
| | | STATE OF LOUISIANA |
| | * * * * * * * | |

CONSOLIDATED WITH:                    CONSOLIDATED WITH:

THERON AND SHERRY PFANTZ              NO. 2025-CA-0318

VERSUS

DR. DWIGHT MCKENNA IN HIS
CAPACITY AS THE CORONER, ORLEANS
PARISH CORONER'S OFFICE, AND ABC
INSURANCE COMPANY

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2023-07512, DIVISION "L"
Honorable Kern A. Reese
* * * * * *
**Judge Monique G. Morial**
* * * * * *

(Court composed of Chief Judge Roland L. Belsome, Judge Karen K. Herman, Judge Monique G. Morial)


Grant P. Gardiner
Bruce C. Betzer
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001

Richard C. Trahant
RICHARD C. TRAHANT, ATTORNEY AT LAW
2908 Hessmer Avenue
Metairie, LA 70002


COUNSEL FOR PLAINTIFF/APPELLEE

NOT FOR PUBLICATION

Cedric L. Richmond
Tiffany L. Delery
James M. Williams
CHERHARDY SHERMAN WILLIAMS RECILE & HAYES, LLP
One Galleria Blvd., Ste. 1100
Metaire, LA 70001

COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED AND AMENDED**
OCTOBER 22, 2025

This is a consolidated appeal. The Defendant-Appellant, Dr. Dwight McKenna in his capacity as the Coroner, ("Coroner"), appeals the trial court's March 5, 2025 judgment granting judgment in favor of the Plaintiff-Appellees, Theron Pfantz and Sherry Pfantz, ("Pfantzes). The Pfantzes cross appeal the March 5, 2025 judgment only as to the general damage award of ten thousand dollars ($10,000). For the foregoing reasons, we affirm the trial court's judgment and amend the award of damages.

## Facts and Procedural History

On or about September 24, 2022, the Coroner's Office was notified of an unclassified death. When the Coroner's Office received the decedent's body, there was no identification on him. Subsequently, an autopsy was performed and the decedent was fingerprinted for identification purposes. Approximately four days later, Kevin L. Bell, an officer with the New Orleans Police Department emailed the Chief Investigator of the Coroner's Office, Brian Lapeyrolerie, identifying the decedent as Benjamin L. **Peantz**[1], date of birth, July 12, 1988, and provided his

---

[1] Emphasis added throughout to highlight the misspelling of Benjamin's last name.

1

state identification number. Shortly thereafter, Adele Stevenson, an investigator for the Coroner's Office ran a TLO search[2], but obtained no results for the decedent's next of kin. Simultaneously, the Pfantzes, were searching for their son, Benjamin, who had recently left a rehabilitation center in Metairie, Louisiana in August of 2022.

According to the Pfantzes, Benjamin had a life-long struggle with alcohol and drug addiction beginning at the age of fourteen. During his battles with addiction, the Pfantzes frequently traveled the state of Louisiana to locate him. Once they found him, they admitted him into several rehabilitation and detox facilities in Houston, Texas, Opelousas, Lake Charles, Baton Rouge, LaPlace, and Metairie, Louisiana. Prior to his death, he was sober, living at home with his parents, and working with his father at his car dealership in DeRidder, Louisiana. On the night of his final disappearance from their home, Benjamin stole a neighbor's truck from his father's dealership. The Pfantzes reported the truck stolen in DeRidder, Louisiana.

Mrs. Pfantz again searched for Benjamin, located him in LaPlace, Louisiana, and placed him in a local detox center. After completing his detox, Benjamin moved to a rehabilitation center, the Avenues Recovery Center: Drug and Alcohol Rehab in Metairie, Louisiana. On or about August 31, 2022, he called the Pfantzes, insisting he wanted to leave rehab. They insisted Benjamin remain

---

[2] The TLO system is a paid search system that accesses credit bureaus, licenses, social media, email and telephone information, which the Coroner's Office uses to locate the next of kin for the decedents in their office.

where he was; they would pick him up the following morning. However, the Pfantzes received a telephone call from their pregnant daughter in Nashville, Tennessee, and decided to travel there for the birth of their first grandchild. While they were on the road to Nashville, they received a call that Benjamin had left rehab.

In early September 2022, the Pfantzes returned to the rehab center in Metairie to obtain information regarding Benjamin and his possible whereabouts. They were advised to search for him in New Orleans, which they did to no avail. In addition to posting flyers and filing a missing person's report, they searched various neighborhoods and underpasses in New Orleans and visited homeless shelters. Unable to locate him, Mrs. Pfantz began calling hospitals in New Orleans and Metairie as well as coroner's offices in an attempt to locate her missing son. She telephoned the Coroner's Office in Orleans Parish sometime in September 2022, but the office initially reported that they did not have Benjamin. The Pfantzes searched fruitlessly for the next eight-and one-half months; they were finally notified on May 12, 2023 that their son's remains were at the Coroner's Office in Orleans Parish.

James Lestage, the District Attorney for Beauregard Parish, a friend of the family and Mrs. Pfantz's employer, reported to Mr. Pfantz that he had received information in May 2023, that Benjamin had passed away. Based on this information, Mrs. Pfantz again telephoned the Coroner's Office in Orleans Parish. She was initially informed that Benjamin had been given a "city burial," burial in a

pauper's grave, and his remains could not be retrieved. In a subsequent telephone conversation, however, the Chief Investigator, Brian Lapeyrolerie, reported that Benjamin had been cremated, and his remains were in the Coroner's Office.

The Pfantzes filed a Petition for Damages in August 2023 principally alleging they suffered severe emotional distress as a result of the Coroner's Office failure to timely notify them they were in possession of their son's remains, and wrongfully cremated their son against their religious beliefs. The Coroner filed a motion for summary judgment in November 2024 alleging that no genuine issue of material fact existed as he and his office are immune from liability pursuant to R.S. 13:5713(I)[3] because the office ultimately identified Benjamin Pfantz, notified his next-of-kin, and cremated his remains pursuant to its statutory duties. The Pfantzes opposed the motion for summary judgment arguing that the Coroner was not immune from liability, and the conduct of his office with respect to their notification of Benjamin's next of kin, and the disposition of remains was outrageous and reckless. The trial court denied the Coroner's motion for summary judgment finding that a genuine issue of material fact existed regarding his potential violation of La .R.S. 13:5713(I)(2). Trial in this matter commenced on

---

[3] I. (1) Liability shall not be imposed on an elected coroner or his support staff based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
(2) The provisions of Paragraph (1) of this Subsection are not applicable to any of the following:
(a) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists.
(b) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

4

February 25, 2025, and judgment in favor of the Pfantzes was granted on March 5, 2025.

## **Standard of review**

A trial court's factual findings made after a bench trial are reviewed with the manifest error/clearly wrong standard of review. *Reaver v. Degas House, L.L.C.*, 22-0464, p. 3 (La. App. 4 Cir. 3/13/23), 359 So.3d 570, 573. The manifest error standard of review "precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record viewed in its entirety." *Hall v. Folger Coffee Co.*, 03-01734, p. 9 (La. 4/14/04), 874 So.2d 90. 98. It is important to note that the appellate court simply cannot decide that it would have found the facts of the case differently. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099, p.8 (La.7/5/94), 639 So.2d 216, 221. In *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La. 1993), this court developed a two-pronged approach for the reversal of the factfinder's determinations. *Id*.

> First, "[t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court." *Id*. Second, "the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous)." *Id.* [T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id*. "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Id*. *Hamilton v. Burns*, 16-0107, p. 4 (La. App. 4 Cir. 9/28/16), 202 So.3d 1177, 1181 (quoting *Stobart v. State*, 617 So.2d at 882).

5

## Discussion

The Coroner asserts four assignments of error in his appeal of the trial court's judgment in favor of the Pfantzes: (1) the trial court erred in finding his conduct outrageous and reckless; (2) the trial court erred in finding him liable pursuant to La. R.S. 13:5713 and La. R.S. 13:5714 although his office ultimately identified and notified Benjamin Pfantz's next of kin of his demise; (3) the trial court erred in finding that the Coroner failed to take action after the TLO search produced zero results; (4) lastly, the trial court erred in finding that the Coroner's actions rose to the level of extreme misconduct, although his staff did not act with ill intent or malice during the investigation. In their cross appeal, the Pfantzes submit that the trial court abused its discretion in awarding a damages award that "shocks the conscience."

In this consolidated matter, we first address the Coroner's assignment of errors. The dispositive issues in the Coroner's appeal are whether he was immune from liability pursuant to La. R.S. 13:5713 and La. R.S. 13:5714, and whether the conduct of his office during the Benjamin Pfantz investigation rose to the level of outrageous and reckless.

## Immunity

The Coroner argues that pursuant to La. R.S. 13:5713(I)(1)[4] he is immune from liability based upon the performance or the failure to perform policymaking or discretionary acts when those acts are in the course and scope of his duties. In

---

[4] I. (1) Liability shall not be imposed on an elected coroner or his support staff based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

his brief to this court, the Coroner alleges that discretionary acts of his office include choosing the methodology for identification of bodies and notification of next of kin. To support his claim of immunity, he asserts that he and his office complied with his statutory duties as Benjamin Pfantz was ultimately identified, and the Pfantzes were notified of his death. Brian Lapeyrolerie testified that the policy in place when he began working at the office was that a New Orleans Police Department ("NOPD") liaison officer fingerprints decedents, analyzes the results, and provides those results to the Coroner's Office. The Coroner[5] also reported that his office relies on the NOPD for fingerprinting and identifying decedents in their care due to budgetary constraints, and staffing issues. He stated that his office does not verify the information it receives from the police department, but depends on the accuracy of their information.

The Coroner attributed the misidentification of Benjamin Pfantz to the NOPD, and denied responsibility.

> "There was no mistake made in the coroner's office. And I want that very clear. Now, could we--should we have found the mistake made by the police officer? We wish we would have. In the end, we did find out it was wrong. But we didn't make the mistake. The police department made the mistake."

During his deposition, the Coroner also testified that he is not involved in the process of identification and notification of next of kin. Instead, his staff is tasked with those administrative procedures, which his Chief Deputy, Brian Lapeyrolerie, oversees. Instead, the Coroner, himself, oversees the medical component of his office; specifically reviewing autopsies, determining cause and manner of death, and preparing death certificates.

---

[5] Dr. Dwight McKenna only testified during a deposition and was not called to testify at trial. The only members of the Coroner's Office to testify at trial were his Chief Deputy, Brian Lapeyrolerie, and the front desk clerk, Quian Williams.

La. R.S 13:5713(H) sets out specific parameters for the identification of decedents by the coroner. The statute provides, in pertinent part:

> In deaths investigated by the coroner where he is not able to establish the identity of the dead body by visual means, fingerprints, or other identifying data, the coroner shall have a qualified dentist or forensic anthropologist or forensic pathologist carry out a dental examination of the dead body. If the coroner, with the aid of the dental examination, is still not able to establish the identity of the dead body, the coroner shall prepare and forward the dental examination and other identifying records to state and local law enforcement agencies.

Pursuant to the statute while the Coroner may avail himself of several methods of identification during a death investigation, it is ultimately his responsibility to establish the identities of the decedents in his office, not the NOPD. The statute mandates that the Coroner work in tandem with law enforcement agencies and medical providers to ensure proper identification of decedents. But, that did not occur here. The Coroner's Office conducted one TLO search to determine next of kin, and performed no follow up when the search did not produce any results. Further, when Sherry Pfantz initially called the Coroner's Office in September 2022, the desk clerk conducted an MDI log search,[6] by his name only. She did not search by date of birth, or ask for identifying marks such as surgical scars or tattoos. As a result, Benjamin Pfantz remained misidentified for over eight months, and was cremated before his family was notified of his death.

Regarding the notification of the next of kin, La. R.S. 13:5714(A) states:

> "The coroner or his designee shall make every reasonable effort to notify the next of kin in all cases of deaths for which he has jurisdiction including but not limited to deaths enumerated in R.S.13:5713(A).

---

[6] The MDI log is a system employed by the Coroner's Office to identify decedents.

Adele Stevenson was the on-duty investigator who ran the TLO search after Benjamin Pfantz was brought to the Coroner's Office. During his deposition, Mr. Lapeyrolerie initially could not remember which of his investigators worked on Benjamin's case. Though he is responsible for administrative oversight in the Coroner's Office, he testified that he did not discuss other methods of determining next of kin with Ms. Stevenson or other staff members after the TLO search produced no results. He further testified that it is common practice of the office to periodically re-run names through the TLO search if next of kin is not immediately identified. He stated that trying to identify next of kin is an "ongoing process." In fact, he would often run a follow-up search himself, but honestly could not recall if he had done so in Benjamin's case. Although, the Coroner's staff is encouraged to consult with him if they encounter problems determining next of kin for decedents in their care, he could not explain why there were no further searches to determine Benjamin's next of kin.

Further, Mr. Lapeyrolerie could not pinpoint any affirmative action taken on behalf of the Coroner's Office to correctly identify Benjamin's remains, or to notify his family after the single TLO search. Neither he nor his staff members, contacted NOPD to verify the spelling of Benjamin's last name. Even though, NOPD provided Mr. Lapeyrolerie with Benjamin's state identification number, neither he nor his staff contacted any law enforcement agency, including the Louisiana State Police, to confirm his identity.[7] Mr. Lapeyrolerie only availed himself of the free search engine, NAM US[8], after the correct identification of

---

[7] Mr. Lapeyrolerie has previous law enforcement experience having worked with The Louisiana State Police. He is also the liason in the Coroner's Office for law enforcement agencies.

Benjamin and notification to his next of kin had already been made. He also testified that the office did not request a dental examination for Benjamin Pfantz because they were unaware at the time that he was misidentified.

While the Coroner's Office ultimately takes credit for correctly identifying Benjamin Pfantz and notifying his next of kin, it was the discovery of Benjamin's death by the Sheriff in DeRidder, Louisiana, and the conversation between Theron Pfantz and James Lestage, as well as Sherry Pfantz's multiple telephone calls to the Coroner's Office that actually triggered the correct identification of Benjamin's remains. Mr. Lapeyrolerie had no explanation for how law enforcement in DeRidder, Louisiana was able to obtain the accurate identification of Benjamin Pfantz, but the Coroner's Office could not. Moreover, neither the Coroner nor, his Chief Deputy were aware that the front desk clerk, Quian Williams, was responsible for determining Benjamin Pfantz's correct identity, and making the notification to his family. The Coroner, during his deposition, stated: "It might have been Quian. It may have been Quian. I don't know the exact person who did that, but we got it right." Meanwhile, Brian Lapeyrolerie was still trying to determine how the correct identification of Benjamin and the subsequent notification was made at the time of his deposition.

Quian Williams testified that it was not usual practice to ask for additional identifying information during telephone calls such as date of birth, or physical identifiers such as tattoos, but she recalled doing so on the second call with Mrs. Pfantz, to go above and beyond to assist her in finding her loved one.

---

[8] During his deposition, Mr. Lapeyrolerie acknowledged that the Coroner's Office did not use other free resources to confirm Benjamin's identity or to determine his next of kin such AFIS, LSU FACES, even GOOGLE.

With respect to identification of decedents and notification of next of kin Brian Lapeyrolerie testified at trial that these are mandatory duties of the Coroner.

> Q. In Louisiana, Mr. Lapeyrolerie, both body identification and notification of Next of kin are required by statute, correct?
>
> A. Correct.
>
> Q. Mandatory, correct?
>
> A. You said "manual?"
>
> Q. Mandatory.
>
> A. Mandatory, yes.

He further agreed that the identification and notification process did not fall under the purview of the Coroner's policy making decisions.

The trial court did not specifically address whether the Coroner is immune from liability pursuant to the above-cited statutes; however, we find the plain and unambiguous language of these statutes,[9] makes clear that identification of decedents and notification of next of kin are not discretionary acts, or policy-making decisions, but statutorily prescribed duties. Although Benjamin Pfantz was ultimately identified and his parents notified of his death, we do not find that these statutes afford the Coroner blanket immunity. Accordingly, the trial court was not clearly wrong in finding the Coroner liable. This assignment of error lacks merit.

### Outrageous and reckless misconduct

The Coroner argues that his office did not act with ill intent or an active desire to cause harm to the Pfantzes, which would be required to overcome his

---

[9] La. R.S.1:3 provides: Words and phrases **shall** be read with their context and **shall** be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, **shall** be construed and understood according to such peculiar and appropriate. The word "**shall**" is **mandatory** and the word "may" is permissive.

11

immunity protection. Pursuant to La. R.S. 13:5713(I)(2)(b), the Coroner lacks immunity for "acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." Thus, the immunity enjoyed by the Coroner and provided by these statutes may be ameliorated by misconduct in the performance or omission of his duties. The Pfantzes argue in contrast that the misidentification of their son for approximately nine months, the failure to timely notify them of his death, and the disposition of his remains by cremation constitute outrageous and reckless misconduct by the Coroner's Office.

During the investigation of Benjamin Pfantz's death, the Coroner's Office initially believed that Benjamin was correctly identified as Benjamin **Peantz** by NOPD although the TLO search following the identification produced zero results for next of kin. Within thirty days of receiving this identification, Brian Lapeyrolerie authorized the cremation of Benjamin Pfantz's remains pursuant to La. R.S. 9:1551(B).[10] Between September 2022 and May 2023, Sherry Pfantz made several calls to the Coroner's Office trying to locate their son, but was told repeatedly that Benjamin was not there. Quian Williams, the front desk clerk at the Coroner's Office, recalled speaking to Mrs. Pfantz twice during this time period, although the office's chronology log only notes the telephone call in which Benjamin was finally identified on May 12, 2023. Ms. Williams testified that

---

[10] If a decedent's remains are not claimed, unclaimed, or abandoned, and the decedent had known assets or property of a sufficient value to defray the expenses of disposition, the coroner shall arrange for disposition of the remains within thirty days, preferably by a recognized funeral establishment. The invoices for the expenses of disposition shall be forwarded to the public administrator if there is one in the parish or to the clerk of the district court if there is no public administrator, and the person or official authorized by law to be appointed administrator of the succession of the decedent shall provide for the payment of the disposition expenses out of the assets of the decedent in accordance with the existing provisions of law for the administration of successions and in accordance with the provisions of this Part.

when she initially searched the MDI log by the first and last name provided by Mrs. Pfantz, she obtained no results.

During the first telephone call, Ms. Williams did not use Benjamin's date of birth in the initial search because it was not protocol. She also was unaware that there were unclaimed bodies in the Coroner's Office at the time she spoke with Mrs. Pfantz. She testified that she did not consult with other staff members regarding the unclaimed bodies in the office because it also was not protocol. Ms. Williams testified that there are no written protocols or policies for administrative issues in the Coroner's office. The training for her position consisted solely of her observation of the prior front desk clerk. Brian Lapeyrolerie also testified that the policies and procedures employed by the Coroner's Office were verbal. He and other members of the Coroner's staff were subject to on-the-job-training, not written training manuals.

Quian Williams ultimately discovered the misspelling of Benjamin's last name in May 2023 only after Sherry Pfantz called the Coroner's Office based on information received from James Lestage regarding Benjamin's death. Ms. Williams reported that during the second telephone call with Mrs. Pfantz she requested Benjamin's date of birth, and searched the MDI log for a second time. The search produced one result, that of Benjamin Pfantz. She realized then that last name of **Peantz** was likely a misspelling. She then asked Mrs. Pfantz if her son had any identifying marks on his body; Mrs. Pfantz provided her a description of Benjamin's tattoo. After consultation with the on-duty investigator, Ms. Williams informed Mrs. Pfantz that the Coroner's Office was in possession of his remains

13

which could be retrieved for a fee of three thousand two hundred dollars ($3,200).[11]

The following day, Mrs. Pfantz called the Coroner's Office in order to secure her son's remains. She spoke with investigator, Monisha Bell, who advised that Benjamin had a "city burial," and his remains could not be recovered. The Pfantzes spoke with Mr. Lapeyrolerie a few days later, and he reported that they received misinformation, the office was actually in possession of Benjamin's remains. He explained that "city burial"[12] was a general term used in their office to denote cremation. He reported to the Pfantzes that Benjamin had not been buried in a city plot; however, he in fact had been cremated. The Pfantzes wanted an assurance from Mr. Lapeyrolerie that the cremains were that of their son Benjamin. Although he insisted that the office still held Benjamin's cremains, he reported that DNA testing to confirm his identity was impossible.

The Coroner further testified during his deposition that the conduct of his office was reasonable and appropriate during the investigation of Benjamin Pfantz. He stated that he was unsure whether his office should have double-checked the TLO results after it produced zero results for next of kin. He defended his staff's actions, decried malicious intent, and affirmed that the police department was responsible for the misidentification of Benjamin Pfantz. He stated:

> "[w]e don't have the benefit of hindsight. And if we look back on it now, perhaps we could have done a better job, but we didn't. But what we did was completely within the bounds of the coroner's office. While we wish we would have-- it was reasonable what happened. And what is most important to me is that while the family member has angst associated with how long it took us, in the end we got it right."

---

[11] Mr. Lapeyrolerie waived the city burial fee.
[12] In his deposition testimony, Mr. Lapeyrolerie stated that "city burial-- is sort of what we use when we have unclaimed bodies."

14

Mr. Lapeyrolerie, in tandem with his boss, testified that regarding the identification of Benjamin and the notification of his next of kin, the Coroner's Office "got it right."

We do not agree. We do not find it reasonable that the remains of Benjamin Pfantz remained unclaimed for eight- and one-half months because the Coroner's Office failed to run a second TLO search, or search the MDI log by his date of birth. The testimony and evidence in the record demonstrates that the Coroner's Office failed to confirm the spelling of Mr. Pfantz's uncommon name with the NOPD, or other law enforcement agencies. The office also failed to review missing persons reports around the time of Benjamin's demise. As a result of this inaction, Benjamin was classified as unclaimed, and cremated within thirty-seven days of his arrival to the Coroner's Office.

We also find that the lack of written protocols, policies and training manuals in the Coroner's Office, the lack of communication among the staff during Benjamin's investigation, the dearth of supervision by the Coroner and his Chief Deputy, and the failure to verify the accuracy of the identification by the NOPD are glaring omissions that rise to the level of outrageous and reckless misconduct. Although Mr. Lapeyrolerie testified that it was protocol to rerun a TLO search if it initially produced no results, he could not explain why a second search did not occur in Benjamin's case. Moreover, he promised the Pfantzes that he would investigate, follow up with them, and discipline staff members; however, at the time of trial he admitted that no such measures had been taken. Based on the totality of the circumstances, we find no error in the trial court's assertion that there was no follow-up by the Coroner's Office to confirm Benjamin's identity after the TLO search.

15

While we do not believe that the conduct of the Coroner's Office rose to the level of malicious intent to harm the Pfantzes, the Coroner, himself, cannot escape liability for the outrageous and reckless misconduct displayed in the errors and omissions of the office. One of the principal tenets of the Coroner's mission statement is to "[p]rovide compassionate service to the afflicted, the grieving, the maltreated and the deceased." Instead, the Coroner seeks to relieve himself of liability by blaming the NOPD for the misidentification for Benjamin Pfantz while simultaneously cloaking himself in immunity from a statutory duty that he has eschewed. The failure of the Coroner's Office to correctly identify Benjamin Pfantz for over eight months, and to notify his next of kin is an abrogation of the Coroner's statutory duty, and his obligations to Benjamin Pfantz and his family. Accordingly, we find that the trial court did not commit manifest error in finding the Coroner liable, and deeming his conduct outrageous and reckless.

## Damages

Turning to the Pfantzes appeal of the trial court award of damages, the only issue presented for review is whether the trial court abused its discretion by awarding ten thousand dollars, ($10,000) for the emotional distress suffered by the Pfantzes.

## Standard of Review

The standard of review for a general damages award is an abuse of discretion. *Bouquet v. Wal–Mart Stores, Inc.,* 08–0309, pp. 4–5 (La.4/4/08), 979 So.2d 456, 459. The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and view the evidence firsthand. *Id.* "The role of the appellate court in reviewing general damages, is not to decide what it considers to be an appropriate

16

award, but rather to review the exercise of discretion by the trier of fact." *Rayford v. Willow Ridge Care and Rehab Center, Inc.*, 43, 377, p. 6 (La. App. 2 Cir 8/13/08), 988 So.2d 904, 908. "The trial court has abused its discretion if the award is so disproportionate to the injury that it shocks the conscience." *McCloskey v. Higman Barge Lines, Inc.*, 18-1008, p. 11 (La. App. 4 Cir. 4/10/19), 269 So.3d 1173, 1182.

In order for a plaintiff to recover on a cause of action for intentional or negligent infliction of emotional distress, proof must exist that the defendant violated a legal duty to the plaintiff, and the plaintiff must meet the high burden of outrageous conduct by the defendant. *Succession of Harvey*, 97-2815, p. 10 (La. App. 4 Cir. 6/24/98), 716 So.2d 911, 917. The plaintiff must demonstrate "an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that a claim is not spurious." *Doerr v. Mobil Oil Corp.*, 04-1789, p. 8 (La. App. 4 Cir 6/14/06), 935 So.2d 231, 237 quoting *Moresi v. State Dep't of Wildlife and Fisheries*, 567 So.2d 1081, 1096 (La. 1990). "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261(La. 1993).

The Pfantzes argue that the $10,000 general damage award by the trial court is inconsistent with the trial court's finding that the Coroner's Office engaged in reckless and outrageous conduct during the death investigation of Benjamin Pfantz. Specifically these "nominal damages" fail to compensate them for the mental anguish and emotional distress suffered from the futile search for their son, and his

cremation, which violated their religious beliefs. Theron Pfantz described the eight month period between Benjamin leaving rehab and discovering that he died as "pure hell" for him and his wife. He testified that his son was a loving, intelligent and talented person who struggled with drug addiction for most of his adult life. Mr. Pfantz detailed the thousands of dollars they spent on rehabilitation and detox centers for Benjamin, and how they constantly provided a loving home, support for their son, and would never abandon him.

Mr. Pfantz was appalled at the conflicting information that he received from the Coroner's office after Benjamin's death had been confirmed. He and his wife were first told that the office was in possession of Benjamin's remains. The next day, they were informed that they could not retrieve his remains because he had a "city burial" and was buried in a pauper's grave. He alleges that staff members in the Coroner's office made the erroneous assumption that Benjamin was homeless. Days later, Mr. Lapeyrolerie informed them that Benjamin had been cremated on Halloween.

Mr. Pfantz testified that cremation was against his family's religious beliefs. They viewed Halloween as one of the most evil days of the year, and when they discovered that Benjamin had been cremated on that day, "[It] was a slap in the face." Mr. Pfantz acknowledged on cross-examination that he had not sought medical treatment for depression, but that his business has suffered, he is apathetic about his work, and has experienced significant weight gain. He testified that he and his wife's lives were forever changed; they would never be the same after the death of their son.

Sherry Pfantz testified that they loved Benjamin even though his struggle with addiction took a huge toll on their family. She recalled holding him once and

telling him, that she would never give up on him. She testified as to the frequent calls she made to the Coroner's Office when they were searching for her son; it became a routine during her daily commute to work. She often cried herself to sleep, but continued to feel hope that he was still alive each time the Coroner's Office denied having Benjamin. On May 12, 2023, Mrs. Pfantz was devastated to discover that her son had passed away.

Mrs. Pfantz testified that Benjamin's cremation robbed the family of having a traditional funeral in accordance with their family tradition and religious beliefs.[13] After receiving conflicting information from the Coroner's staff about whether Benjamin had a "city burial," or whether they could retrieve his remains, Mrs. Pfantz does not know if she can believe that the ashes she received were really those of her son. The search for her son had a detrimental effect on her professional life; she ended her career because she could no longer manage her stress. Mrs. Pfantz did not seek medical treatment for her emotional distress. Instead, she was counseled by her brother, and both she and her husband sought solace in prayer and attending church.

In a similar appellate case, the daughter and sister-in-law of Martha Bob Rayford, a nursing home resident, were informed during a telephone call that they were unable to visit their loved one for Thanksgiving as she had died sixteen days earlier, and had already been buried. *Rayford v. Willow Ridge Care and Rehab Center, Inc.* 998 So.2d 904, 906. After filing suit for their mental anguish, the trial court awarded each party $2,500 in general damages. *Id*. On appeal, the court amended the general damage award to $5,000 per plaintiff finding the trial court

---

[13] The Pfantzes did host funeral service for their son, but believed in burial in the family plot, not cremation.

abused its discretion, "because we do not believe it adequately considered the deep level of grief sustained by Shirley and Jo Sherl upon learning, in such a callous way that Martha had died." *Id.* at 908.

We also find that the trial court abused its discretion in awarding the Pfantzes $5,000 each. The trial court noted the agony the Pfantzes endured in the eight- and one-half month search for their son, and found that the Coroner's Office "took absolutely no action whatsoever" in reasonably notifying them of Benjamin's death. Yet, the trial court's general damage award does not reflect the deep level of grief the Pfantzes experienced upon learning of the death of their son.

The evidence has shown that the Coroner and his staff have taken no responsibility for their egregious conduct in the investigation of Benjamin Pfantz, instead blaming NOPD for making the mistake, but taking credit for ultimately identifying Benjamin. The Coroner's Office also acted with callous indifference to the Pfantzes in assuming that Benjamin was homeless, giving them conflicting information about the whereabouts of his remains, and referring to Mr. Pfantz as "nasty" when he was trying to obtain information from their office regarding the death of his son. Their grief was further heightened when they were unable to bury their son according to their religious and family traditions. The Pfantzes and their family were denied closure, and the opportunity to say goodbye to Benjamin because the Coroner's Office failed to take reasonable measures to correctly identify him and notify his next of kin. For these reasons, we amend the general damage award to each of the Pfantzes to $25,000.00, for a total award of $50,000.00.

**Decree**

For the foregoing reasons, we affirm the trial court's March 5, 2025 judgment granting judgment in favor of Theron and Sherry Pfantz. We also amend the general damages award of $10,000 and increase it to $50,000.00.

**AFFIRMED AND AMENDED**